HUDSON *v.* BELZONI EQUIPMENT Co. *et al.*

(In Banc.   February 9, 1948.)

[33 So. (2d) 796.   No. 36663.]

Green & Green, Edwin R. Holmes, Jr., and Julia Griffin, all of Jackson, for appellant.

218

V. B. Montgomery, of Belzoni, for appellees.

Argued orally by **Julia Griffin** and **Edwin R. Holmes, Jr.,** for appellant, and by **V. B. Montgomery,** for appellees.

**Roberds, J.,** delivered the opinion of the court.

On April 28, 1941, appellant Hudson borrowed from the Citizens Bank & Trust Company of Belzoni, Mississippi, $779.17. He executed two notes therefor payable on demand, or if there be no demand, on January 28, 1942.

He pledged to the Bank, as collateral security for said notes, thirty-one shares of stock in appellee, Belzoni Equipment Company, a corporation, domiciled at Belzoni. After maturity of the notes the Bank transferred and delivered them, with the stock, to the Equipment Company. The Equipment Company claims to be the absolute legal owner of the stock. Hudson contends the Company is a pledgee holding the stock as security for a debt he owes it and that he has the right to pay the debt, with interest, and redeem the stock. He filed the bill in this cause for that purpose and made proper tender. The Chancellor dismissed the bill. Hudson appeals.

The Equipment Company contends the Bank itself acquired the legal title, as owner, to the stock. A number of reasons might be stated which disprove that contention, but it is sufficient, without more, to say that the record discloses an agreement of counsel that the stock was deposited with the Bank as collateral security for the notes.

The Equipment Company next asserts that it acquired such absolute title when the Bank transferred the stock to it. It says the notes and stock certificates, as well as a letter written by Hudson to the Bank, vested in the Bank the power to sell, and in the Equipment Company the right to buy, the exclusive ownership of the stock, and that such was the agreement it had with the Bank. These are the facts pertinent to that question: In June, 1942, Hudson was, and had been since its organization in 1940, the President of the Equipment Company and Chairman of its Board of Directors. Nothing had been paid upon the notes. There is evidence of an oral agreement to pay $25 per month on the notes. Just when that was to begin is uncertain. However, it is immaterial because it is admitted the notes were in default. He also owed the Company an unsecured open account of $965.76. He was leaving Belzoni to enter upon war work for the Government. On June 6, 1942, he wrote the Bank the following letter:

"This is your authority to, after the thirty-one shares of Belzoni Equipment Company stock in my name which you have as collateral is paid for, turn this stock over to Belzoni Equipment Company or hold same as their collateral for money I owe them, in case this money has not been repaid before my stock is paid for.

"In case anything should happen that I do not finish paying for my stock as agreed, I would like for you to agree by endorsing this letter to notify Belzoni Equipment Company and give them the privilege of paying out the stock on the same basis as my agreement with you.

"Thanking you for all past courtesies, I am,

"Yours very truly,

"Signed: W. C. Hudson."

Following that, and on July 17, 1942, the Bank, through Mr. Paul Townsend, its Active Vice-President, wrote the Equipment Company this letter:

"We have a letter dated June 6th, 1942, from W. C. Hudson asking us to deliver stock in your company to you after the amount due us by him was paid, however, Mr. Hudson has made no payments on this indebtedness which has been past due since January 28th, 1942.

"Mr. Hudson owes us two notes one for $516.67 and one for $262.50, with interest at 6% from April 28th 1941, against which we hold 31 shares of stock in your company.

"If you care to take up this indebtedness we will be glad to deliver the stock to you, otherwise we are going to have to sell the stock and liquidate the amount due us, as we cannot carry this in the present form."

The Directors of the Equipment Company met on July 24, 1942, and adopted a resolution, the part pertinent hereto being:

"On motion made by B. S. Reed, and seconded by T. L. Reed, Jr., it was unanimously resolved that as W. C. Hudson was no longer connected with the Company in an active capacity that he be removed from his offices as President, Chairman of the Board and Director. . . .

It being brought before the Board that the Citizens Bank and Trust Company, Belzoni, Mississippi, was holding in trust thirty-one shares of stock issued to W. C. Hudson, and that said stock was being held by the Citizens Bank & Trust Company as collateral for an amount due them by W. C. Hudson, which amount was now in arrears, and that the thirty-one shares of stock had been declared forfeited by the Citizens Bank and Trust Company, on motion made by B. S. Reed and seconded by T. L. Reed, Jr., it was unanimously resolved that C. L. Hooker be empowered to negotiate with the Citizens Bank and Trust Company for the purchase of the stock by the Company and that said stock be retired. It being further resolved that said W. C. Hudson will be eligible to repurchase his stock from the company only after his account owing to the company, as reflected on the Company's books, be paid in full. It being further resolved that copies of these minutes be forwarded to W. C. Hudson and the Citizens Bank and Trust Company, Belzoni, Mississippi.''

On July 25, 1942, the Equipment Company paid the debt Hudson owed the Bank and the Bank transferred and assigned to the Company, without endorsement and without recourse, the two Hudson notes and the thirty-one shares of stock. Thereupon the Equipment Company retired and cancelled the stock. It sent Hudson a copy of this resolution. That was the first Hudson knew of that transaction or of any negotiations leading thereto. In reply Hudson wrote the Equipment Company protesting any attempt to ''foreclose'' his stock. That letter is not in the record, so we do not know its exact wording. He sent a copy of that letter to the Bank. In reply, and on August 19, 1942, the Bank wrote Hudson the following letter:

''We are in receipt of a copy of your letter to the Board of Directors of the Belzoni Equipment Co., and note that you say we foreclosed your stock. What we did was to sell your note to the Belzoni Equipment Co., without recourse on us. In view of the fact that you had

given us a letter to deliver the stock to them, we considered that they had a second mortgage, so to speak, on the stock anyway, and the man with a second always has the right to take up the first in order that he may have the collateral.

"We are sorry that you feel that we are wrong in this and if we can be of assistance to you in working this out with the Company, will be glad to do so."

Later the Bank wrote attorneys for Hudson that it had simply sold to the Equipment Company the notes "without recourse on us."

The notes provide that upon, or after, default the Bank had the power to sell, assign and deliver all, or any part, of the pledged stock at any broker's board, or at public or private sale, without advertisement or notice, at which sale the Bank had the right to purchase, the proceeds of the sale to be applied to the payment of the secured debt, and any balance to be paid to the pledgor of the stock. The stock certificates conferred upon the corporation the right to purchase the stock "at the contemplated sale or alienation price" if the owner desired to sell, and obligated the owner to give the corporation notice of "such fact of sale or alienation."

It will be noted the Bank gave no notice of the contemplated sale of the stock and made no effort to procure competitive bids therefor. The proof discloses the pledged stock was worth more than twice the Bank debt. In fact, Hudson used the money he borrowed from the Bank with which to purchase five shares of stock from Mr. Townsend and ten shares from Townsend's brother-in-law, Mr. Allen Pepper. He pledged thirty-one shares. However, we deem it unnecessary for us to decide whether under the law applicable to pledges the method here adopted could have constituted a legal sale so as to vest absolute ownership title in the Equipment Company for the reason the evidence establishes the fact the Bank did not intend or attempt any such sale. The letters written by Townsend expressly so state. He says the Bank

simply sold the notes. In addition he so testified as a witness. He was asked "There was no foreclosure at all? A. No, sir. Q. You sold those notes without recourse on you? A. Yes, sold them by delivery—didn't endorse them at all—and didn't mark them paid." Certainly the Bank had no intention of conveying full legal title to the stock. It is true that two of the directors of the Equipment Company testified they considered the Company was buying title to the stock, but the undisputed facts conclusively show, in our opinion, that this conclusion was not accurate. The resolution of the directors proceeded on the assumption the Bank had already "forfeited" the stock, and had acquired absolute ownership thereof, before the transfer to the Company, and it was buying this previously acquired title—not that the adopted method of transfer created and vested title under provisions of the notes and certificates. In addition to this the Company carried the Hudson open account on its books as an obligation owing the Company until the first of 1943, when it was charged off as a bad debt. The Bank delivered the Hudson notes to the Company and the Company had the possession thereof at the time of the trial. Had the Bank and the Company regarded this transaction as a sale of the stock in payment of the notes to the Bank and the open account owing the Company, then the Bank should have marked the notes paid and sent them to Hudson rather than deliver them to the Equipment Company, and the Company should have then marked the open account paid rather than carry it as an obligation on its books and later charged it off as a bad debt.

Nor does the Hudson letter of June 6, 1942, change the character of ownership of the Equipment Company from that of a holder of the stock as security to that of absolute owner. That letter deals with two contingencies—first, in case Hudson should pay the Bank debt, and, second, in case he did not do so. If he paid the debt, he directed the Bank to deliver the stock to the Equipment

Company to "... hold same as their collateral to money I owe them ... " in case the Company debt had not then been paid. In the second contingency—that is, if he had not paid the Bank debt—he authorized the Bank to deliver the Equipment Company the stock "and give them the privilege of paying out the stock on the same basis as my agreement with you." The agreement referred to evidently meant the oral agreement to which we have made reference. The reference to "paying out the stock" meant the Bank debt used to purchase the fifteen shares of stock. It could not have had reference to the entire thirty-one shares of stock, because sixteen of these shares had already been paid for. So that in either event, or both events, the Equipment Company was to have title to the stock as pledgee to secure either one debt or both debts.

It is urged that Hudson is barred by laches from bringing this suit. This poses a serious question. The pertinent facts are: The action of the Equipment Company under which it claims title to the stock took place July 24, 1942. The resolution proceeded on the assumption the Bank had already "forfeited" the stock. Hudson, as soon as he learned of this, wrote the company protesting any such action, sending the Bank a copy of the letter. The Bank informed Hudson the stock had not been sold or forfeited. In the fall of 1942 Hudson was again in Belzoni and discussed with the directors the redemption of this stock. He did not have the money himself with which to redeem it but another had agreed to lend him the money if he could purchase other stock, added to his own, to constitute a majority of the stock. However, a majority of the stock was not available. Hudson was not then informed by the Equipment Company it would contest his right to redeem the stock in question. Hudson went back to his war work and nothing further was done about the matter until he was relieved of his war work duties. In July, 1946, Hudson requested the Company to let him know the total of the two debts, in-

cluding the interest. He was then ready and able to pay his obligation. The Company refused to inform him the amount and to accept the money and told him to see an attorney. This was the first time Hudson had information the Company would refuse his right to redeem his stock, either under his general right to redeem as a pledgor or under the terms of the resolution expressly giving him that right. It will be noted the resolution, while expressly giving Hudson the right to redeem the stock, did not specify the time in which the right could be exercised. It is further shown that the value of the stock in July, 1946, was several times greater than in July, 1942. The Company has retired the stock. It will be seen that four years elapsed from the time of the action under which the Company claims to have acquired title to the stock and the time when Hudson was able to pay his debt and redeem the stock, although it appears from his evidence he intended all along to do so, and to return to Belzoni as his home after his war work was over, and that, at different but indefinite times, he so informed the officers of the Company.

The right of Hudson to bring this action would have been barred in six years from the time he had knowledge of the action and claim of the Company. Section 722, Code 1942. Aside from statutes of limitations, laches, in this State, is not merely delay in asserting a right, but delay that results in injustice or disadvantage to another and time is only one element. There must be some element of estoppel, or intervention of the rights of third parties, or change in the relation of the parties, such as would make it inequitable and unjust to permit the party to then assert his right. Comans v. Tapley, 101 Miss. 203, 57 So. 567, Ann. Cas. 1914B, 207; Sample v. Romine, 193 Miss. 706, 8 So. (2d) 257. This inequity or disadvantage may come about from loss of evidence, change of title, intervention of equities, rights of third persons, or for other reasons. No set rule can be stated. Each

case must stand upon its own facts. Now, in this case the only change which has come about is the increased value of the stock. Nothing Hudson has, or has not, done had anything to do with that. The stock would have increased in value just the same whether he had or had not redeemed it. It is shown this increase has come about mainly because Hudson, while he was president and manager of the Company, had accumulated by trade-ins an unusually large amount of used farm equipment and machinery, which the Company, after he left for his war work, was able to sell at very high prices owing to the shortage of such equipment and the inflationary war prices. The only effect of this change, as to the Company, is it has retired the stock and thereby relieved itself of the corporate liability therefor. It has not sold the stock to any one else. No rights of third persons have intervened. The all important fact in this case is the Company kept the notes evidencing the debt to the Bank and did not credit Hudson with payment of his account to it. It had the notes at the trial. It could have sued Hudson at any time upon the notes and the open account. It will be noted, too, that when Hudson wrote the Bank, June 6, 1942, the Company had no security whatever for the open account. He voluntarily made it possible for the Company to hold his stock as security for that debt. Too, at any time the Company could have taken steps to properly foreclose upon and sell the stock for the debts in the manner required by the terms of the notes and the stock. The Company is the one who failed to act. Smith v. Becker, 192 Mo. App. 597, 184 S. W. 943. A pledgor has the right to exact a strict performance of the contract. Upon default in payment of the obligation the title to the pledged property does not vest in the pledgee but remains in the pledgor, subject to the trusteeship. Where the pledgee is not required to sell the collateral he is not compelled to do so. First Trust Deposit Co. v. Potter,

155 Misc. 106, 278 N. Y. S. 847. We do not think Hudson was estopped by laches to bring the suit in this case.

This is a bill for redemption and an accounting. The stock has been retired. The bill will lie in such case. 18 C. J. S., Corporations, Sec. 432(3).

Reversed and remanded.

**Alexander** and **McGehee, JJ.**, dissenting.